FILED 8 MAY '23 10:32USDC-ORP

J. Bryan Quesenberry (OSB 230218)
903 East 430 South
Salem, UT 84653
801-473-9951
jbq.esq@gmail.com
*Counsel for Plaintiff/Relator*

UNITED STATES DISTRICT COURT
DISTRICT OF OREGON

| | |
|---|---|
| UNITED STATES OF AMERICA, ex rel. AIDAN FORSYTH,<br><br>Plaintiff,<br><br>vs.<br><br>LUAY KHAMIS ALJAMAL; CEILING PRO OF OREGON, INC.; CONCORDE DEVELOPMENT COMPANY; CONCORDE, LLC; DB TALAK LLC; ETH ENTERPRISES LLC; HALEEB INVESTMENT LLC; KAZIRAH LLC; LTKM LLC; SABER INVESTMENTS LLC; SIAM INVESTMENTS LLC; SPARIUM LLC; THE BATH CLUB, INC.; TRUST COFFEE INC.; and AJA ASSOCIATIONS LLC,<br><br>Defendants. | **COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT**<br><br>**(Filed in camera and under seal)**<br>**(DO NOT PLACE ON PACER)**<br><br>**JURY TRIAL DEMANDED**<br><br><br>Case No. 3:23-CV-679-AR |

Plaintiff-Relator Aidan Forsyth, acting on behalf of the United States of America (the **"Government"** or the **"Federal Government"**) and against Defendants, alleges based upon personal knowledge, relevant documents, information, and belief, as follows:

### INTRODUCTION

1. This is an action to recover damages and civil penalties on behalf of the United States of America arising from false and/or fraudulent records, statements, and claims made and

#10550

caused to be made by Defendants and/or their agents and employees, in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, *et seq.* **("the FCA")**.

2. This action seeks to recover millions of federal dollars borrowed by the entity defendants through the Federal Government's Payroll Protection Program **("PPP")**. The PPP provides a pathway to borrowers for forgiveness of these loans.

3. Pursuant to the PPP, the Federal Government has spent billions of dollars in stimulus funding, as well as other federal funding, to support and aid legitimate businesses through the coronavirus pandemic.

4. This action alleges that Defendant Luay Khamsi Aljamal used a number of shell companies (the other Defendants) to apply for PPP funds and received PPP funds despite the PPP application and rules requiring PPP borrowers to have been in operation prior to February 15, 2020, having the number of employees represented on the PPP loan application, and requiring businesses to actually perform real business activities.

5. The FCA was enacted during the Civil War, and was substantially amended in 1986, and again in 2009 and 2010. Congress amended the FCA in 1986 to enhance the Federal Government's ability to recover losses sustained as a result of fraud against the United States after finding that fraud in federal programs was pervasive and that the FCA, which Congress characterized as a primary tool for combating government fraud, was in need of modernization. The amendments create incentives for individuals to come forward with information about fraud against the Federal Government without fear of reprisals or inaction, and enable the use of private legal resources to prosecute fraud claims on the Federal Government's behalf.

6. The FCA prohibits, *inter alia*: (1) knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and (2) knowingly making or

using, or causing to be made or used, a false or fraudulent record or statement material to a false or fraudulent claim. 31 U.S.C. §§ 3729(a)(1)(A), (B). Any person who violates the FCA is liable for a civil penalty for each such claim, **plus three times the amount of the damages** sustained by the Government. 31 U.S.C. § 3729(a)(1)(A) (as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990 [28 U.S.C. § 2461 note; Public Law 104-410]).

7. In 2009, Congress amended the FCA to clarify that a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest…" 31 U.S.C. § 3729(b)(2).

8. The FCA allows any person having information about an FCA violation to bring an action for himself and the Federal Government, and to share in any recovery. The FCA requires that the complaint be filed under seal for a minimum of 60 days (without service on Defendants during that time) to allow the Federal Government time to conduct its own investigation and to determine whether to join the suit.

9. Based on the foregoing laws, *qui tam* Plaintiff/Relator seeks through this action to recover all available damages, civil penalties, and other relief for the violations alleged herein in every jurisdiction to which Defendants' misconduct has extended.

## PARTIES

10. Plaintiff/Relator Aidan Forsyth (**"Relator"**) is a resident of New York. He brings this action on behalf of the United States of America, the real party in interest.

11. Upon information and belief, Defendant Luay Khamis Aljamal (**"Aljamal"**) is an individual residing at 1124 SE River Forest Rd, Milwaukie, OR 97267.

12. As detailed below and upon information and belief, Aljamal organized at least 14 entities that he used as sham businesses to apply for and obtain multiple PPP loans <u>in the amount of $2,827,400, of which, $2,456,316.23 was ultimately forgiven</u>. Upon information and belief, these 14 businesses had few to no real employees and performed no real business activities.

**Ceiling Pro of Oregon, Inc.**

13. On 9/6/1994, Aljamal registered Defendant Ceiling Pro of Oregon, Inc., whose principal place of business is in Beaverton, OR. Ceiling Pro of Oregon, Inc. was originally a d/b/a of LKA Ceilings, Inc., until LKA Ceilings, Inc. was dissolved on 5/28/1998. *See*, Exhibit A1.

14. On 7/20/2020, Aljamal registered a new entity, also named Ceiling Pro of Oregon, Inc. (**"Ceiling Pro"**), whose principal place of business was Portland, OR. *See*, Exhibit A2.

15. Ceiling Pro was approved on 8/8/2020 for a PPP loan of $189,300 and again approved on 1/16/2021 for another PPP loan of $149,500, which totaled $338,800 in PPP funds. *See*, Exhibit D1. Of these PPP funds, $150,000 were forgiven.

16. Ceiling Pro was administratively dissolved in 2021, then reinstated by Aljamal later that year. Ceiling Pro was again administratively dissolved in 2022 (for good). *See*, Exhibit A2.

17. Upon information and belief, Ceiling Pro had no employees, performed no real business activities, and was a sham entity used by Aljamal to apply for and obtain PPP funds.

**Concorde Development Company**

18. On 3/9/2001, Aljamal registered Concorde Development Company, whose principal place of business was Gilroy, CA. From 2001 to 2013, this entity made multiple real estate purchases throughout Oklahoma. This entity was dissolved on 5/10/2013. *See*, Exhibit A3.

19. Aljamal registered a new entity on 7/23/2018, also named Concorde Development Company (**"Concorde Development"**), whose principal place of business was Portland, OR. *See*, Exhibit A4.

20. Concorde Development was approved on 5/27/2020 for $20,000 of PPP loan funds, and again approved on 4/4/2021 for $20,800 of PPP loan funds (totaling $40,800), which loans were forgiven. *See*, Exhibit D2.

21. Aljamal is the sole manager of Concorde Development. *See*, Exhibit A4.

22. This entity was administratively dissolved by the Oregon Secretary of State and then reinstated by Aljamal twice from 2019 to 2021, then administratively dissolved for good on 9/29/2022. *Id.*

23. Upon information and belief, Concorde Development performed no real business activities and was a sham entity for Aljamal to fraudulently apply for and obtain PPP funds.

**Concorde, LLC**

24. On 12/30/2003, Aljamal registered Concorde, LLC, whose principal place of business was Oregon City, OR. *See*, Exhibit A5. This entity was administratively dissolved in 2009.

5

25. On 7/20/2020 – after the 2/15/2020 PPP entity operation deadline[1] – Aljamal registered a new entity also named Concorde, LLC **("Concorde")**, whose principal place of business was Portland, OR. *See,* Exhibit A6.

26. Concorde was approved for a $197,500 PPP loan on 7/27/2020 and a second PPP loan on 2/19/2021 for $149,800. *See,* Exhibit D3. Both PPP loans (totaling $347,300) were forgiven.

27. Aljamal was the sole manager of Concorde. Concorde was administratively dissolved in 2021, reinstated that year, and then administratively dissolved again (for good) in 2022. *Id.*

28. Upon information and belief, Concorde performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds. *Id.*

## DB Talak LLC

29. On 5/29/2018, Aljamal registered DB Talak LLC **("DB Talak")**, whose principal place of business was Portland, OR. *See,* Exhibit A7. DB Talak bought real estate on 11/18/2019 (*see,* Exhibit F2), and used to perform engineering services. *See,* Exhibit C1.

30. DB Talak was approved for a $20,800 PPP loan on 5/1/2020 and another $135,000 PPP loan on 3/4/2021, totaling $155,800. Both loans were forgiven. *See,* Exhibit D4.

31. Aljamal is the sole manager of DB Talak.

32. Upon information and belief, DB Talak performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

---

[1] See first item in the *Certifications* section of PPP application.

### ETH Enterprises LLC

33. On 6/23/2020 – after the 2/15/2020 PPP entity operation deadline – Aljamal registered ETH Enterprises LLC (**"ETH Enterprises"**), which did business in Portland, OR. *See*, Exhibit A7.5.

34. ETH Enterprises applied for two PPP loans. The first was approved on 6/30/2020 in the amount of $81,900. The second was approved on 4/3/2021 in the amount of $83,400. Both PPP loans, totaling $165,300, have been forgiven. *See*, Exhibit D5.

35. ETH was administratively dissolved in 2021 and then was reinstated later that same year. ETH was again administratively dissolved (for good) in 2022. *Id.*

36. Upon information and belief, ETH performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

### Haleeb Investments LLC

37. On 8/5/2020, Aljamal registered Haleeb Investments LLC (**"Haleeb Investments"**) – after the 2/15/2020 PPP entity operation deadline – which had a principal place of business in Portland, OR. *See*, Exhibit A8.

38. Haleeb Investments was approved for a $196,300 PPP loan on 8/8/2020 and a $149,500 PPP loan on 3/3/2021 (total PPP loan amount was $345,800). *See*, Exhibit D6. Both loans were forgiven.

39. Aljamal was the sole manager of Haleeb Investments.

40. Haleeb Investments was administratively dissolved in 2021 and then reinstated later that same year. Haleeb was again administratively dissolved (for good) in 2022. *Id.*

41. Upon information and belief, Haleeb Investments performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**Kazirah LLC**

42. On 7/2/2020, Aljamal registered Kazirah LLC (**"Kazirah"**) – after the 2/15/2020 PPP entity operation deadline – which had a principal place of business in Portland, OR. *See*, Exhibit A9.

43. Kazirah was approved for a $148,600 PPP loan on 7/22/2020 and a $149,100 PPP loan on 2/16/2021. *See*, Exhibit D7. Both loans, which total $297,700, were forgiven.

44. Kazirah was administratively dissolved in 2021 and then reinstated later that same year. Kazirah was again administratively dissolved (for good) in 2022. *Id.*

45. Aljamal was the sole manager of Kazirah.

46. Upon information and belief, Kazirah performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**LTKM LLC**

47. On 6/23/2020, Aljamal registered LTKM LLC (**"LTKM"**) – after the 2/15/2020 PPP entity operation deadline – which had a principal place of business in Portland, OR. *See*, Exhibit A10.

48. LTKM was approved for a $81,900 PPP loan on 6/26/2020 and a $114,100 PPP loan on 2/8/2021. *See*, Exhibit D8. Both loans, which total $196,000, were forgiven.

49. LTKM was administratively dissolved in 2021 and then reinstated later that same year. LTKM was again administratively dissolved (for good) in 2022. *Id.*

50. Aljamal was the sole manager of LTKM.

51. Upon information and belief, LTKM performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**Saber Investments LLC**

52. On 6/8/2020, Aljamal registered Saber Investments LLC **("Saber Investments")** – after the 2/15/2020 PPP entity operation deadline – which had a principal place of business in Portland, OR. *See*, Exhibit A11.

53. Saber Investments was approved for a $20,500 PPP loan on 6/18/2020 and a $20,800 PPP loan on 4/8/2021. *See*, Exhibit D9. Both loans, which total $41,300, were forgiven.

54. Saber Investments was administratively dissolved in 2021 (for good). *Id.*

55. Aljamal was the sole manager of Saber Investments. *Id.*

56. Upon information and belief, Saber Investments performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**Siam Investments LLC**

57. On 7/2/2020, Aljamal registered Siam Investments LLC **("Siam Investments")**, which had a principal place of business in Portland, OR. *See*, Exhibit A12.

58. Despite not being in operations prior to 2/15/2020, Siam Investments was approved for a $194,300 PPP loan on 8/3/2020 and a $149,800 PPP loan on 4/8/2021. *See*, Exhibit D10. Both loans, which total $344,100, were forgiven.

59. Siam Investments purchased real estate at 2700 Underhill Lane, West Linn, OR 97068 for $240,000 on 1/7/2021. *See*, Exhibit F3.

60. Aljamal was the sole manager of Siam Investments.

9

61. Siam Investments was administratively dissolved in 2021 and then reinstated later that same year. Siam Investments was again administratively dissolved in 2022, and later reinstated. *See*, Exhibit A12.

62. Upon information and belief, Siam Investments performed very little real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**Sparium LLC**

63. On 3/1/2019, Aljamal registered Sparium LLC **("Sparium")**, which had a principal place of business in Portland, OR. *See*, Exhibit A13.

64. Sparium was approved for a $72,500 PPP loan on 5/7/2020 and a $130,700 PPP loan on 1/19/2021. *See*, Exhibit D11. Both loans, which total $203,200, were forgiven.

65. Aljamal was the sole manager of Sparium.

66. Sparium was administratively dissolved in 2022 and then reinstated later that same year. *See*, Exhibit A13.

67. Upon information and belief, Sparium performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**The Bath Club, Inc.**

68. On 3/1/2019, Aljamal registered The Bath Club, Inc. **("Bath Club")**, which had a principal place of business in Portland, OR. *See*, Exhibit A14.

69. Bath Club was approved for a $73,700 PPP loan on 4/28/2020 and a $26,600 PPP loan on 2/18/2021. *See*, Exhibit D12. Both loans, which total $100,300, were forgiven.

70. Aljamal was the sole manager of Bath Club.

10

71.     Aljamal created a website for Bath Club sometime around September 2020. On its website, it claims to sell a subscription for two sponges for $9.99/month. *See*, Exhibit C3. The business did not have significant sales, and did not employ eight people like the PPP loan application stated. In fact, Bath Club had no employees.

72.     Bath Club was administratively dissolved in 2023. *See*, Exhibit A13.

73.     Upon information and belief, Bath Club performed no real business activities during the time in question, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**Trust Coffee Inc.**

74.     On 9/24/1996, Aljamal registered Trust Coffee, Inc., which had a principal place of business in Portland, OR. *See*, Exhibit A15. This entity was part of Aljamal's bankruptcy proceeding and was dissolved on 11/23/2001.

75.     On 3/23/2021, Aljamal registered a new entity <u>with the same name</u>, Trust Coffee, Inc., which had a principal place of business in Portland, OR. *See,* Exhibit 16.

76.     Despite not being in operation prior to 2/15/2020, Trust Coffee was approved for a $148,600 PPP loan on 4/8/2021. *See*, Exhibit D13. This loan was forgiven.

77.     Aljamal was the sole manager of Trust Coffee.

78.     Trust Coffee was administratively dissolved in 2022, then reinstated in 2023. *See,* Exhibit A13.

79.     Upon information and belief, Trust Coffee performed no real business activities during the time in question and had no employees, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

**AJA Associates, LLC**

80. On 6/18/2008, Aljamal registered AJA Associates, LLC ("AJA Associates"), which had a principal place of business in McMinnville, OR. *See*, Exhibit A17. At one point, this entity performed engineering services. *See*, Exhibit C4.

81. According to AJA Associates' website, it has six employees. However, these employees work at other companies. For example, according to AJA Associates' website, Elvert U. Chisley is "Executive Director" of AJA Associates. *See*, Exhibit C5. According to Chisley's extensive LinkedIn profile spanning his 43-year career, he never worked at AJA Associates. *See*, Exhibit C6. The entity received $102,000 of forgiven PPP loans.

82. AJA Associates was approved for a $20,500 PPP loan on 5/6/2020, and another PPP loan on 3/26/2021 in the amount of $81,900, totaling $102,400. *See*, Exhibit D14. These loans were forgiven.

83. Aljamal was the sole manager of AJA Associates.

84. Upon information and belief, AJA Associates performed no real business activities during the time in question and had no employees, but was a sham business used by Aljamal to fraudulently obtain PPP funds.

85. Aljamal indicated on the PPP loan applications for the above borrower entities that they were "Female Owned." Upon information and belief, these were misrepresentations.

## JURISDICTION AND VENUE

86. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Although this issue is no longer jurisdictional after the 2009 amendments to the FCA, to Relator's knowledge there has

been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint, as those concepts are used in 31 U.S.C. § 3730(e), as amended by Pub. L. No. 111-148, § 10104(j)(2), 124 Stat. 119, 901-02.

87. Moreover, whether or not such a disclosure has occurred, Relator would qualify as an "original source" of the information on which the allegations or transactions in this Complaint are based. Relator researched and discovered the pertinent entity information and individual information of each Defendant.

88. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a) because Defendants reside, have their principal places of business, or do business in Oregon.

89. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in and/or transacted business in this district, and because violations of 31 U.S.C. §§ 3729 *et seq.* alleged herein occurred within this district. At all times relevant to this Complaint, Defendants regularly conducted substantial business within this district.

## THE PAYCHECK PROTECTION PROGRAM

90. Congress added sections 1102 and 1106 of the Coronavirus Aid, Relief, and Economic Security Act (**"CARES Act"**). Section 1102 contains a new program called the Paycheck Protection Program (**"PPP"**) and is party of the U.S. Small Business Administration's (**"SBA"**) 7(a) Loan Program. These two sections are intended to provide economic relief to small businesses nationwide adversely impacted by the coronavirus pandemic and the COVID-19 Emergency Declaration issued by President Trump on March 13, 2020.

91. Due to the COVID-19 emergency, many small businesses nationwide are experiencing economic hardship as a direct result of the Federal, State, and local public health measures that are being taken to minimize the public's exposure to the coronavirus.

92. The SBA received funding and authority through the CARES Act to modify existing loan programs and establish the new PPP loan program to assist small businesses nationwide adversely impacted by the coronavirus pandemic.

93. Section 1102 of the Act temporarily permits SBA to guarantee 100% of 7(a) loans under the PPP. Section 1106 of the CARES Act provides for forgiveness of up to the full principal amount of qualifying loans guaranteed under the PPP.

94. The CARES Act was intended to provide relief to America's small businesses expeditiously.

95. The CARES Act gives lenders delegated authority to process loan applications for PPP funding. SBA allowed lenders to rely on certifications of the borrowers in order to determine eligibility of the borrower and use of loan proceeds, and to rely on specified documents provided by the borrower to determine qualifying loan amount, and eligibility for loan forgiveness. Lenders are held harmless for borrowers' failures to comply with PPP rules.

96. Defendants had to submit documentation necessary to establish eligibility such as payroll processor records, payroll tax filings, form 1099s, income and expenses documentation.

97. In general, Defendants calculated an amount to borrow by aggregating payroll costs from the previous 12 months for employees whose principal place of residence is the United States. Annual employee salaries are capped at $100,000. The borrower then calculated the average monthly payroll cost and multiplied that amount by a factor of 2.5.

98. One certification on the Application states, "Current economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant."

99. Defendants also "further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects."

100. Finally, Defendants certified on the PPP loan applications that they "understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000."

## ALLEGATIONS

101. As alleged above, Almajal made the following misrepresentations to enable the Defendant entities to obtain PPP loans:

   a. That the entities were in operation prior to 2/15/2020, when some were not.

   b. That they were female owned, which they were not.

   c. That they had a certain number of employees, which they did not. Rather, the Defendants inflated the number of their employees to obtain PPP funds.

   d. That the Defendants had ongoing operations which necessitated the PPP loans, which they did not.

   e. That the Defendants would use the PPP funds pursuant to the requirements stated in the application, which they did not.

102. Plaintiff used his own efforts, techniques, and abilities to review and analyze data from the SBA, from the Oregon Secretary of State, bankruptcy courts, LinkedIn, and other sources to uncover Defendants' misconduct alleged above.

103. Defendants thus made material misrepresentations on their loan applications, knowing lenders and the Federal Government would rely on said representations in paying funds to the entity Defendants.

104. Relator reserves the right to amend this Complaint and expand these allegations upon review of the actual applications and supporting documentation submitted by Defendants.

## **False Claims Act**

## **31 U.S.C. § 3729(a)(1)(A)-(B)**

105. Relator realleges and incorporates by reference the allegations contained in the foregoing paragraphs as though fully set forth herein.

106. This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729, *et seq.*, as amended.

107. By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to the United States Government, or authorized agent of the United States Government, for payment or approval.

108. By virtue of the acts described above, Defendants knowingly made or used, or caused to be made or used, false, or fraudulent records or statements material to false or fraudulent claims for payment by the Government.

109. Relator cannot at this time identify all of the false claims for payment that were caused by Defendants' misconduct. The false claims were presented to third party lending

institutions. Relator does not have access to the records of all such false or fraudulent statements or claims.

110. Lenders, acting on behalf of the Federal Government, were guaranteed 100% of the PPP loans from the Federal Government. Said lenders were unaware of the falsity of the records, statements, and claims made or caused to be made by Defendants. Said lenders paid the claims that would not be paid but for Defendants' misconduct.

111. By reason of Defendants' acts, the United States has been damaged, and continues to be damaged, in a substantial amount to be determined at trial.

112. Additionally, the United States is entitled to a maximum penalty for each and every violation arising from Defendants' unlawful conduct alleged herein.

## **PRAYER**

WHEREFORE, *qui tam* Plaintiff/Relator prays for judgment against each Defendant as follows:

1. That this Court enter judgment against each Defendant in an amount equal to three times the damages the United Sates has sustained because of Defendant's actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each violation of 31 U.S.C. § 3729;

2. That Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d);

3. That Relator be awarded all costs of this action, including attorney's fees and expenses; and

4. That Relator recover such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relator hereby demands a trial by jury.

Dated: May 6, 2023

Respectfully submitted,

*/s/ J. Bryan Quesenberry*
J. Bryan Quesenberry
Counsel for Relator